Secretary, U.S. Department of Health and Human Services, Appellant. Ms. Marcus for the Appellant Cross-Appellee, Alex Azar, and Ms. Collins for the Appellee Cross-Appellant, Pomona Valley Hospital Medical Center. Thank you. Good morning. I'm Stephanie Marcus from the Department of Justice, and I represent Appellate Cross-Appellee, the Secretary of HHS. In this case, the district court erred by holding that the final decision of the agency, here the decision of the Provider Reimbursement Review Board, was not supported by substantial evidence. The board was addressing a challenge by Pomona Valley Hospital to Medicare payments known as Disproportionate Share Hospital, or DSH, for a three-cost year. Specifically, Pomona is challenging the Secretary's determination of the number of patient stays attributable to Medicare beneficiaries who are also entitled to exit costs. That determination is governed by a 2010 notice and comment rulemaking that Pomona is not disputing applies here, and that fully set forth the Secretary's methodology and data and a revised matching process for how the Secretary determines which Medicare beneficiaries are also entitled to exit costs. And here, the board properly discussed the regulation and relied on it for CMS's process of calculating the numerator of the Medicare action. The district court, in contrast, erred by holding that the regulation was irrelevant, essentially, that it was going to look at whether the board's decision was supported by substantial evidence. But the error is, in making that inquiry, the regulation governs the board's determination and is part of the substantial evidence. Right, a methodology can be misapplied, right? And so, Pomona could come to the board and say, we have no beef with the 2010 methodology, but we think due to human error, it was misapplied. That's not a challenge to the 2010 methodology, correct? Correct. And in that instance, Chevron would have nothing to say about the outcome of that case, correct? Correct. However... Why is this not that case? Because here, the question would be whether they then submitted substantial evidence showing that there was some error in the process or that there was something wrong. And here, the board issued an extremely thorough decision, record-based decision. In the room, we have cited numerous places in the record where the board found discrepancies in the data that Pomona asserted was congruent. To me, that's where the rubber hits the road. But it has nothing to do with whether the 2010 methodology is sound. And so, therefore, there's no legal challenge to the 2010 methodology. And Chevron doesn't tell us anything about whether substantial evidence supported the CMS's application of the 2010 methodology. Well... Are we still good? Maybe, Your Honor. I mean, again, it's not a challenge to the regulation. I agree with that. And therefore, we're not using Chevron to see whether you should defer to the Secretary's interpretation because Pomona is accepting that for this case. And where the problem here with the District Court Pomona's analysis is that when you have a regulation like that that isn't being challenged, the District Court in Pomona essentially puts CMS in a worse position. It says, oh, we're going to shift the burden of proof that ordinarily applies in word proceedings pursuant to agency regulations. And, for example, in... And here's the Secretary's... I mean, what the main DC Circuit's opinion that the District Court relied on in shifting the burden to the Secretary is the Atlanta College of Medicine. And that one, the DC Circuit first found that on Chevron one basis, the Secretary's interpretation was contrary to the statute. And then it actually expressed sympathy with the Secretary's administrative concerns and said, and under the circumstances, it would seem quite reasonable for the Secretary to adopt regulations or even adjudicatory presumptions as to what a school must show. And I might... The District... Sorry. I'm on the same line. The District Court probably overstated in saying that it overstated to the extent it that the regulation has nothing to do with anything here. Right. But we're reviewing De Novo. Yeah. And it seems like we all agree that the regulation structures the inquiry and that Ponoma is arguing that not that the regulation is wrong, but that for whatever reason, it was misapplied here. Right?  Right. And the problem then is you get to the evidence Mona presented to the board. Let's wait. Let me walk through the evidence and you tell me where I'm not thinking about this. Mona puts forth this evidence, preponderance of the evidence standard, so they don't have to prove beyond a reasonable doubt that their balance is the perfect amount. They don't have to prove that beyond a reasonable doubt, they just have to prove beyond a preponderance of the evidence. They put forth expert testimony, they use the Medi-Cal data, et cetera, et cetera. And the government comes back and says, there's three problems. Number one, some of that Medi-Cal data is including people only get state and not. Which Mona comes back and says, okay, we'll adjust according to how you tell us to adjust. So by the time the like re-briefing is done, the post hearing briefing, that error is no longer an error. And then the government has identified two other errors, one to do with nursing homes and one to do with what time in a month the person is signed up. And Mona has expert testimony that says those errors are statistically insignificant, which the government produces, responds with no expert testimony. And the government has this kind of fourth category of, well, because of these first three errors, there might be some more. They don't identify any doubt. Is that, I know I've described the case in a way that, you know, you probably don't like the slant of it, but what's actually wrong about what I just said? What's wrong, Your Honor, respectfully, is that Mona, remember, is not challenging a Mona had a chance to make comments on, other providers did, and that rulemaking established the best available data for the inquiry. This makes a lot of sense. You're trying to determine who is entitled to supplemental security income, a federal benefits program, and CMS uses SSA data. And that's where they get the data. Mona sometimes says that there's a very high, you can't have providers come forward with data from 50 different states. And here, Mona was trying to show congruence, right, with its data and Social Security Administrator's data, and it simply didn't show that. It would have to show that to meet its burden. And in fact, the state supplement, both payments only issue, Mona didn't correct until after the hearing, after it was pointed out. If there's no problem with the data, let's assume that, but let's imagine a case much like this, but we'll assume in that case, human error, data entry, was the cause of a vast discrepancy between what was paid and what should have been paid. Well, on the one hand, I do, Mona also agrees that the best available data is the correct legal standard. And under that, that does allow for errors. It doesn't require perfect accuracy. And so what a hospital would need to show is that if they're not challenging CMS's determination of the best possible data, that for some reason, because of application of the process, CMS didn't actually use the data it was saying it was using, or their, and it simply is enough legally for- I don't know if you all didn't use it, I mean, this all happened, I think, in California where a computer just didn't read the bottom half of a spreadsheet, right? You could have, when we talk about human error, I think we need to include computer error. And so what they're trying to show is something went wrong here. And so, yeah, we got a bit large, that's fine. Your methodology is fine without challenging it. But even in the rule, you acknowledge that, look, you could still have what I will call an as-applied challenge. And something went, not to the rule, but to the as-applied challenge of what happened here. Whether it's input or the computer just didn't read, it was two-sided information that only went- Well, an example- That challenge could be brought. Yes, and- And how would they prove that challenge? Since they don't have those files, they go, well, look, Med-Cal says we have, we got it, we're off by 25% here in our numbers. So something went wrong. Would that be an appropriate, if you just came in and said, I'm hypothesizing that what happens is the computer didn't read the flip side of the document for some reason. And so it only got part of the data, it didn't get all of the data in, even though everyone tried their best and applied the methodology. And so, and the way they were able to prove this gap is they went to Med-Cal or whatever documentation they used, and it shows we've got a 25% gap between who's eligible on these and who's eligible there. Now, maybe the secretary will have an explanation, but they've shown a 25% gap, and so something went haywire in the process. Why isn't that the type of challenge that the rule reserves? That type of challenge, Your Honor, can be brought, and that's, we've said that. We are not alleging that the process is infallible or unreviewable. Here, the problem is in the data itself, which the board thoroughly shows that it's not congruent. The age codes in California don't match up one-to-one, and they gave Pomona a chance to put forward evidence about what those age codes meant, 10, 20, and 60, and to show that they weren't- In fact, they showed that it meant age-blind and disabled. They did, but that could be far more broader. But those are their people that are getting SSI. If you back out the supplemental people, that's their people who are getting the SSI. They actually did not show that, Your Honor, with all due respect. What they say in their reply brief is that over 90% of the SSI-entitled people that were shown in the MedCard Section 951 data CMS did give them, that was 96% of those go into the 10, 20, and 60, but what they didn't show was who else is in the 10, 20, and 60. There are a number of those people we already know. State supplemental payment only eliminated over 50% of their claim days. I'm sorry, I didn't hear. One of you. The state, the SSP- The adjustment for SSP. Yes.  And that was a very significant adjustment. It's an old adjustment. But I wanted to get back to your question about a challenge with the computer error, some really major error. The MedCard data does give that the Secretary did provide here and did in accordance with There's another rulemaking that's not being challenged and explains what the Secretary, what data the Secretary can and will give the hospital. If they get that, that data shows them the patient days to which there is the same entitlement data for their patients, like which of their patients were entitled to SSI. If they claim like 2,000 patient days and the MedCard comes back and shows that, you know, 1,500 of them were entitled to SSI, and then in their Medicare faction, for some reason, the agency just left out, you know, half of the patient days that its own data shows were included, that would be, you know, a way of showing an error because they're using the data that CMS itself used in the process, but they don't have the SSI. What they have, Your Honor, is the MedCard, which is some sort of aggregate SSI measure. I've forgotten. Month by month or something. It does. And it does show that hospitals would be able to show which it would be able to determine based on that which of their patients were deemed entitled to SSI. And that's what CMS gets from the Social Security Administration. Well, but they also get the SSI, right, which is, as I understand it, way more granular, patient by patient, right? It's the SSI. The kind of data that might show the counting errors, the coding errors, the human errors. Your Honor, the SSI eligibility file is, and you're right, that isn't turned over to the hospitals because it contains a lot of privacy information because it's for a month, it's for thousands of hospitals, not just MODA. It can't just, the agency can't just turn over the file because they're giving like a 15-month period. You may well have very good privacy and administrability reasons for not giving out that massive dump of data. But it puts the hospitals in a tough position when they're facing numbers that just don't look right and they have a burden of proof to try to explain why. So what else could they do other than try to reverse engineer through something like Medi-Cal? They, and again, they can use that information to reverse engineer and to some extent, to a large extent, this is because of how Congress has set up the DISH formula itself by making the numbers dependent on SSI. You say they can reverse engineer? And here they did reverse engineer. He pointed to three problems with how they reverse engineered. They fixed the first problem with regards to supplemental states and the other two problems the expert witnesses testified were statistically insignificant. So it seems like they reversed engineered pretty well. Maybe not perfectly, but beyond a ponderance of evidence, pretty well. One fact that they found, they found still a 20 to 25% gap between New York County and Medi-Cal. Right? Wait, wait. Right. So I'm just adding that in so that they found we're all five people, which would go to your administrability point or your non-perfection point. So even after supplemental payments are backed out, there's a 20 to 25% gap, even though there's a 96% gap, as you pointed out, between who we're counting. Right? The patients. Oh, no. That was just, I was just trying to repeat their point that the people who are entitled, and everyone agrees, are entitled. Right. And they found 96, I think 96 or 97% overlap between who Med-Cal's counting. This is their expert testimony. It may be an answer to it, but their expert testimony was we got 96%, I think it was 96% Maybe this is what the board could have explained, but they didn't say this. Whatever you're about to say, I don't think they would have said it unless you can tell me where they said it. We've got this many people. So Med-Cal, there may be a few people they shouldn't even know we've taken out the supplemental SSI. But there's a huge amount of overlap, and yet we're having a 20 to 25% gap in patient days that are being counted. So that's... I don't mean to hijack your question. It's not an overlap. It's what they're saying is of the days that CMS agreed and they got credit for, those went within one of those three codes. What the board was asking them to do was to do a ratchet back the other way and show us, okay, so we know your three codes. Yes, they include the SSI entitled, but they include... The calculations included in those codes, like you showing us a 25% disparity between Med-Cal and our calculations doesn't show anything unless you can show a congruence in the data, which they didn't show. And they gave them the opportunity to do the crosswalk. I mean, that... I think what the board said, which I know you probably can't do this, it's incredibly hard to do, but you should at least try. But they said that the only reason they gave for thinking that there's a big gap is nursing home and the shifting eligibility date, which I'm not sure is going to matter because someone has to be coming at each time. And they had expert... I'm just repeating what my colleagues have said. Expert testimony said that's not going to explain the 20% to 25% difference. And the board saying, well, maybe you could have tried a crosswalk. I'm still not sure how that is responsive. What evidence the secretary put in or what evidence was in the record that would allow the court to say the absence of the crosswalk provided substantial evidence that their 20% to 25% gap was off. I didn't even hear the board saying, we don't understand what those codes are. Those codes are age blind and disabled. But what the board did say is we don't know if they have age blind and disabled people in their state category who are not entitled to SSI as defined in the rulemaking. That's what the board was saying. And there was testimony about the middle discrepancy, but the board pointed out that the information about those other two discrepancies was available to Pomona through the Medi-Cal data. That was its data. Instead of speculating about how many patients statewide are in nursing homes, it could actually look at its patient data, come back to the board, and quantify it. But more importantly, the crosswalk... The expert did testify about the percentages, the small percentages, and how this isn't going to... It's a very small number who are going to fall in this problem. And as to the eligibility, they said, look, this is going to be quite the rare bird when someone is getting Med-Cal but not getting SSI all within the same four-week period. And none of that was rebutted. Had the secretary rebutted it, we'd have something to work with. But how, when that's not rebutted by the secretary? It's because this is where the non-consideration of the rule plays in. That is a reason other than the sufficiency of the evidence. The secretary discussed administrative finality. It discussed not having providers use 50 different sets of data. We have to have one set of data that we use. If a provider comes forward and doesn't show congruence with that data, that's a problem. Why is to show congruence? Why wasn't it good enough? They have two experts who seem pretty credible on their face. One person ran Med-Cal and one person ran the office in CMS that does this DHS stuff. And they said, we've looked at everything and we can't imagine any explanation for 25% gap. Again, that is not quantifiable evidence in the record. And if they had an expert like that, presumably they could at least give the board a definition about what those codes meant. What people were included. And the board did ask some questions at the hearing and pointed out the rulemaking went through a list of codes that SSA uses that do not denote entitlement. And CMS explains why it doesn't use those. And that was another example that could be a discrepancy with the state program. And you're right. Perhaps they could have put on a better case had they run the ground codes. And I'll ask your friend on the other side. But it seems like they still put on a pretty good case through these pretty credible experts. And the government's response was nothing. Not to be flipped, but doesn't something usually beat nothing? Again, from your perspective, it isn't a thing because there is a rulemaking that governs this process that very carefully went through the data. That doesn't address the miscounting or miscounting. They haven't shown any miscounting because the expert declaration they rely on is someone who's talking about Medi-Cal. Nonetheless, they made a big mistake before the hearing about what the Medi-Cal codes meant. I mean, they were going to senators and congressmen when almost half their days were SST only. Is there any reason on the record to believe that there's another material gap between what Medi-Cal includes and what SSI covers? I had sort of thought that 96% and gross. Oh, no. I take it aside then. What is on the record that shows I get why their own state payments, right? I don't want to count those. And those are backed out. Right. And I didn't see the board saying that wasn't backed out in an accurate way. It just talked about it like it hadn't been backed out. So what else, what basis is there in the board decision for thinking that there is a material gap between, with that backed out, between the codes that California is using for the purpose of administering SSI payments and what's used, the codes that are used by SSI? That's where I'm not getting. I mean, you say there could be some other gap, but how do we know there's a material gap? We don't know, but it's the hospital's burden. And that's the hospital's burden of production. And the board found it did not meet it here. And the discrepancies the board did find… No, you guys work with California, right? On what basis in their statute, their rules, or anything that's publicly available is there for thinking that they're including anybody else that isn't an SSI person here? What basis is there for that? Given their definition, given the whole point of having these codes, given the point of what they're measuring, SSI eligibility, that's their goal. These codes, they say, measure SSI eligibility, back out the supplemental payments. For example, the chairman of the board, this is on JA page 208, is talking about asking promoted to do the crosswalk. And he says there are codes in the federal register that are, some of them are actually suspension of payments. And you can look at the federal register. We have it in our agenda. JA where? 208. So it's not in the decision of the board? No. Where in the decision of the board? I think that's what we're reviewing, right? Yes. We don't review the hearing transcript. Yes. Is there evidence of material difference? Your Honor, apologies, but the board on JA 44, the board referred to the hearing and said during the hearing, the board pointed to other reasons of why variances may exist between the eight codes used by Pomona and SSI codes. And then they talk about the ones they did specifically identify. But I was trying to show in the hearing record. Right. And those were taking place at this point on the record evidence are not material ones. So I'm sorry, I just had to figure in their decision, they're going to pick their two best. Am I wrong about that? Would they pick their two worst? I don't think they would reference the two best. Well, I think they picked ones where through their questioning without, I mean, Pomona made an affirmative showing and the board through their questioning at the hearing recognized just from the affirmative show these three discrepancies. I mean, that's pretty significant. One of which was fixed and two of which were not material. And then they said in their decision, and this is JA 46, at the hearing, the board specifically requested a diagram of how information from SSI is translated into the eight codes. And in order to gain insight on how these relate to C01, M01, and M02, it says that this question remains unanswered because Pomona did not submit any additional information. The board acknowledges that building a question might be difficult, but it's necessary to know whether 10, 20, and 60 accurately identified only those individuals with an SSI. Is there anywhere a public definition of these codes?  They did a flow chart of sort of the process of how the agency gets the data, which as we pointed out, and again, this isn't in the board's decision, but it can just—the board did a couple times reference potentially finding these three discrepancies made it concerned that there could be other discrepancies. And Pomona has the burden to show that is not the case. And there could be timing discrepancies. If you look at the flow charts, they get this data weekly. The CMS pulls the data as it shows in the rulemaking at very specific times. So is there— Is there a related thing? I noticed that—I could have just missed it, so please tell me. In the rule, it defined what the federal codes, C01, meant. I didn't see where M01 and M02 are defined. Are they defined in the rule or somewhere else? They are both—all three are—means are entitled to SSI. I don't recall seeing it defined in the rule. So what's the point of figuring out what 10, 20, and 60 mean if there's nothing that I could see in the rule that says what—you can't—there's no point in doing a crosswalk if you don't know what the end of the crosswalk is, what M01 and M02 are, unless it means age-blind, disabled. And California says they're age-blind, disabled. Again, the MedCard data shows it provides to the hospital which patient days were identified as M01, M02, and C01, the three entitlements. But it doesn't—the whole point of the crosswalk is you have your codes, California, 10, 20, 60. Right. And you need to match them up to C01, M01, M02. Right. Okay. Let's say they had all the information in the world about 10—10, 20, 60, is that right? Yeah, 10, 20, 60. But they don't know what M01 and M02 cover. You can't do a crosswalk. Actually, I think the main issue with the crosswalk here is not determining, since all of the entitled data did translate into 10, 20, and 60, 96% did. And as we noted in our brief, Pomona—that didn't stop Pomona from taking the other ones that CMS credited them with that weren't in 10, 20, and 60 and keeping those in the total. But the—what they want to know is what is—what 10, 20, and 60 encompass so we can see if they—if there is anything in there that would map into something that's not M01. And I think that— How would they find that? They could ask. I think it is available publicly. It's not in the rulemaking, but it's probably—I don't know exactly where, but there was— Wouldn't the board have to know that this is something they could find? I think it does. It said it could consult someone from SSA, and that's not privacy information, what the codes mean. The rulemaking does go through a lot of what the codes— Where does it say they can get this definition? It says, by obtaining the definitions of the various codes— Where? Oh, I'm sorry. This is on page— No, no. I'm sorry. I'm sorry. Yeah, I'm on page 46 of here. I'm like, where do they obtain them? Because if this is public record information, then the board would have to— But, again, first of all, they didn't even show what their codes meant. Presumably, they have access to what the Medi-Cal codes mean. That would give you a really good idea when the agency has very carefully defined what entitled to SSI means. It means receiving payment, and the agency also went through a number of codes which various providers, during the rulemaking, said, you know, you really should include this other code. So that information is out there and available to providers, but a provider wouldn't have given—presumably— Again, I didn't see in the rule what M01 and M02 mean. Yes. I still find that quite confusing. But anyhow, they're supposed to go find what 10, 20, 60 mean in California. That's the problem? If they come back with that definition and they say it means age-blind and disabled within the meaning of the Social Security Act, so you're eligible for SSI. Well, entitled in the meaning— Receiving payment. Receiving payment, right. If they come back with a definition of receiving federal SSI payments. I mean, there still might be other problems with timing. I think here they didn't come— No, but the timing thing is one of the things that was flagged here, and that was—the expert said it's not going to make— Oh, I'm sorry. I mean the timing of when the data itself is pulled because if Medi-Cal data is being pulled every week, that's different from what the agency said in the rulemaking. That timing issue isn't referenced by the board, though. The board doesn't talk about that type of timing one. That's the information you have, which is helpful that the secretary didn't put that in. But what the board did say is there could be other discrepancies. If they come back—I'm sorry to ask you to speculate, but just to try to understand the theory here. If they were to come back and say, 10-20-60, we're going to back out the nursing home, guess what? It doesn't matter. And we're going to back out the eligibility dates, the difference between California and SSI, the sort of one-month gap. And then guess what? And they actually did it. They're actually doing it. So they come back, they do that, and they do the same thing for a nursing home. Instead of having the experts say it's not going to be statistically relevant, they do the math. It turns out it's not statistically relevant, but they back those out. And they do the same for the timing. And they say, well, here's your definition of 10-20-60, and it means receiving SSI. It means receiving SSI within the meaning of the Social Security Administration. All right? And then would it be sufficient for the board to go, well, there could be other things? Other problems? I don't—I mean, that's specific. It's like you're putting a lot of weight on that language. There's a problem here that because they didn't do A, B, and C, put aside the supplemental payments, A, B, and C. They didn't do nursing home. They didn't do the difference in eligibility dates. And they didn't give us a definition of 10-20-60. And show that it would correspond to what entitled to SSI means. Right. And if they come back with that, then it would not be sufficient for the board to go, well, there could be other problems. I mean, I think it would depend. The board couldn't—I don't—I think at that point, maybe the board couldn't just say there could be other problems. But, I mean, I think there would—what the board is saying here is what you did didn't meet the burden of production to make the agency produce evidence when it has this rulemaking that you are just—you know, you're providing your own data, which isn't what the— And it doesn't show that the agency didn't use the best available data. It doesn't—you know, inaccuracy isn't enough. And it didn't even show inaccuracy. It's unreliable. It really—the board showed how it was unreliable. So, yes, you'd have a different case. I don't want to speculate what would happen then because you'd have an entirely different case. And I don't know what the board would do with, you know, what the board would ask for. So, just to follow up on it, why should we care about the nursing home and the difference in eligibility dates referenced by the board here since they had unrebutted expert testimony that said those are statistically insignificant? Why should those matter at all? And the board just says, well, there could be other things. Actually, the board didn't just say there could be other things. The board said, okay, maybe you think it would be statistically insignificant, but maybe, you know, if Pomona didn't—if this wasn't a huge number of patient days and one of their patients who was in the hospital for 30 days and one month, there is evidence in—this is on JA109—about when Pomona was sending an email asking about, you know, would the Medi-Cal codes also show not entitled if someone's in a nursing home? And the person says that a recipient going into long-term care would stay in the age codes 10, 20, or 60 for three months. So, what the board is saying, it may be statistically insignificant on a huge statewide basis, but you go back to your data, you tell us about your patients. Were any of them in a nursing home? And Pomona didn't do that. And Pomona also didn't go back and look at when, you know, their own patients were—because the FSI— Are you arguing that it might be statistically significant? Is that the point you're making? I'm just saying that the board gave Pomona the opportunity to quantify with respect to— It is statistically significant, it's not statistically significant, and it might be statistically significant. Which of those three are you arguing? I think I'm arguing with respect to Pomona. It might be. We don't know that. And that they had the chance to go back and look at their own data. So, what we know, all we know is what the record shows. And what the record shows is that it's statistically insignificant, and that's not rebutted. So, how can we say we don't know there could be? Again, going back to what the board asked Pomona to do, here it says, without— Actually, Pomona didn't provide an estimate of the impact of this difference on the additional SSI days being requested. The board does not in Canada know the significance. So, it says they didn't—actually, they didn't even quantify from their own record the number of additional days being requested that were patients that came to Pomona from a nurse. Sorry, what line are you referring to at this point? It's on JA-44, the penultimate line, the last sentence starting with, however. So, what they did is they submitted statewide statistics, but the board is saying they could have gone back and done it for their own data, for their own patients. For Pomona-specific patients. Yeah. Is there any reason to think that there's something unusual about Pomona? I don't know, but, again, it's their— That would have been a great argument for the secretary to have put into the record, is your experts say this, but hospitals can be very different based on their patient population. And so, what's generally statistically significant might not apply to—but I don't have any reason for thinking that the general statistics don't apply with equal force to Pomona statistics. I don't know where this operates. Maybe there's some reason. I think it's because the rulemaking is a function that you don't—you use, you know, the Med part and the SSA data, not state data, to make this determination. So, there's— They don't need to use this data to make a determination. You're trying to just—you're not saying you need to use Med-Cal data. They're saying Med-Cal data makes us go, uh-oh, something went wrong. I don't think maybe they'll say otherwise. I don't think they're saying you guys have to run this with Med-Cal data. They're saying something went wrong here, and it made a showing. And so far, it sounds like you wanted to go back and show that what—regarding the testimony that was statistically insignificant, you just want to run the numbers. I think what—there is a high burden in the face of the rulemaking and administrative finality that to show there actually was a problem in the application of the process. It's preponderance of the evidence. That's the burden. I'm sorry, your Honor? It's the evidence. Is the burden preponderance of the evidence? Yes. It's not bad. But is it preponderance or is it a substantial one? Well, you're an interviewer. And I think that here— The full difference is there's substantial evidence that the board thought there was a preponderance. But it was not a preponderance. Right. Is that soliciting? Yes. I don't know if that's soliciting. Can I ask something unrelated? Not unrelated to the case, but why didn't you just accept the invitation to run a test on the small sample? Your Honor, because that, I think, with the agency not seeing the data, sufficient data to show there was any error, that would—it does not have the resources to perform ad hoc— You get the chances every time the hospital comes along. Right. But here, there's a lot of evidence that there's a lot that might be wrong. We respectfully think there isn't a lot of evidence here and that they didn't make the— But that said, the other—I mean, it is—even doing a sampling involves another agency, the SSA, and they have privacy-protected, HIPAA-protected, in some instances, underlying data about why someone—you know, the specific reason. Like, the hospital can deduce from this which of the states were determined to be entitled to SSI and which weren't. What it doesn't know is why weren't they, right? And so that's—the sampling would go back and look at that, but CMS has, you know, an agreement with SSA that specifically uses this information just for—and CMS doesn't even get those underlying codes. So it would need to go to SSA and do a whole, you know, separate agreement and do— I thought SSA was willing to do the—willing to run the data. I thought the record showed they were—SSA was willing, and then CMS said, sure, and then changed their mind and said, no, we won't. No, Your Honor. There's a letter from the SSA in the record that shows that the SSA was not willing to do the sampling and actually said, you know, we don't understand the confusion. We never said we were willing to do it. And that's—so it's in the—there is a letter in the JAA, and I apologize I don't have the exact site for it, but there—the SSA did say that they were willing to do it, and that's not information CMS has itself. Just one other thing, just to—I know this is many steps down the road, just to try to understand what's happening here. If—imagine they go back and do what you want them to do, and the board goes, wow, there's a problem here. At this point, can these numbers even be rerun by CMS? Or could this—you know, if they said, oh, it turns out some—you can't figure out what human error was, inputting error, did the computer have a glitch? We just can't figure out, you know, the power went out. That turns out the power went out the day this ran, so maybe that's the problem. Could it even be rerun? I'm trying to figure out how this could even be fixed at this point. Your Honor, I think—I mean, there are two answers to this question. If the board had found they came forward with this kind of evidence, then that—if the board actually found that the hospital met the burden of production, then CMS would have an opportunity to come forward with, you know, some kind of evidence. And so we'd have to go through that step, too. And if— Yeah, I'm assuming it's a— Assumption, yes. That's a lot of assumptions. Right. I'm just trying to figure out what remedially has—because by that point, we are probably close to 20 years after the fact. Well, but I think— Is the data still safe somewhere that it could be run again? Or how would this be fixed? I mean, you know, I'm sorry I can't answer in the abstract because I don't know exactly what cost here, you know, it would be. I mean, there are certain things that I think in some of the hypotheticals where you're just looking at MedPAR data and, you know, CMS sent Pomona the MedPAR data for a much smaller hospital in Iowa or something, and that could be fixed. That could be to look at its own information and say, wait, our information doesn't match up with that. If it's something more complicated and using the SSA data, I mean, that—I think that that is another reason that in the rulemaking, some providers said, we want you to go beyond 15 months. And the agency said, there's got to be—we're doing longer periods than we used to before, you know, phase date, but there's got to be some finality here. And the standard for best available evidence in the Methodist Hospital case says this, when it says we're not going to have the agency retroactively apply this new wage index, is using the best available data to you at the time. Thank you, Rachel. We'll give you two minutes for— Oh, thank you. May I please report? I'm Sven Collins, Counsel for Pomona Valley Hospitals. And I'd like to just get a couple words about Pomona, just so you understand who the hospital treats. It's a hospital in California that serves several communities with a high percentage of low-income residents. And, of course, those low-income residents cost more to treat in providing their care. Because of that care, it's very important that the hospital receives the appropriate money that Congress directed. With us today is Candice Leighton, who is Pomona's—handles Pomona's Medicare reimbursement, and she was a witness at the board hearing. And I think I probably don't need to say this, but Pomona did everything it could, and then some, to demonstrate that the Secretary's fractions were incorrect. No, he didn't. He didn't back out nursing home data. He came in with, as I said, general statistics. Instead of arguing that it was statistically insignificant, you could have done it. And you could have dealt with the eligibility and actually cranked the numbers. I know you have witnesses that say it wouldn't have been worth a candle, it wasn't statistically significant. But you could have actually given them more precise data. And the standard is, did you present allegations supported by all the information available to you? That's what it takes to shift the burden, right? You didn't do that. You could have done more. And then they say you could have given us the definitions of the codes 10, 20, and 60. So as to those three specific things, can you tell me why you couldn't actually have backed out the nursing home? Folks, you couldn't actually have backed out based on—adjusted based on eligibility dates, and you couldn't give the definitions of 10, 20, and 60. Yes, Your Honor, and the board's statements in the order are not supported by the record that we could have done those things. There's no testimony that we could have. Is there testimony that you couldn't? What? Is there testimony that you could not have done it? Yes, there is testimony that presented that—well, I don't think there is—they were asked the question, can you provide that? Okay. They weren't asked the question, so there's not— You have the obligation with the information you have available to you, and you're not able to say that you couldn't. With the information you have, that you couldn't have done it. It's just that you didn't do it, and I understand your rationality, and this isn't worth the trouble, but you could have done it as far as this record shows. As far as the record shows, the board did not question us if we could have provided more precision, and so therefore the record does not have anything in there. The reality is, Pomona, that— You're not able to say that you couldn't have done it. I can say that. You cannot or cannot? I can say we couldn't. I can say—I can tell you— I thought you said the record doesn't show that you couldn't have. So, on this record, can you say that you could not have done it? On this record, I can't testify, so no. But— That, anyhow— I'm not asking you to testify. I'm asking you to point something to the record to be clear. I understand, Your Honor. The data that was provided, the unrebutted, unrefuted evidence, was that it was statistically insignificant. And the board—the additional items the board called for, the secretary didn't put any evidence suggesting that it was available to us, that we could. Medicaid—that data is not tracked by Medicare nursing home days. Furthermore, the days—what is in the record, and counsel—my friend on the other side pointed this out, the email from the state Medicaid agency, the sentence she read, she didn't read the entire sentence. It says—and this is about the nursing home patients—they go into long-term care, and they stay in the eight codes—10, 20, and 60—for three months, and then revert to codes 1E, 2E, or 60. What's the importance of that? After three months is when the SSI payments stop. So at that same moment, when the federal payments are stopping, the SS—the Medi-Cal system is coding the patients differently. They're no longer 10, 20, or 60. So therefore, Pomona's record shouldn't have even picked up any of those nursing home residents who are beyond their SSI entitlement. Now, I'd like to just talk about the crosswalk. Yeah, let's do that. I'm sort of with you on the de minimis points, but the failure to provide a crosswalk—what they call a crosswalk—seems like a much bigger problem. Crosswalk's kind of a jargony-sounding term, but what we're talking about is you're trying to use state codes as a proxy for federal data that you don't have access to under these federal codes. And you need to show convergence. And, I mean, that seems like the first step in doing that is figuring out what the federal code covers and what the state code covers. And then you look at the Venn diagram and figure out, is there a lot of overlap or just a little? Yes, and I'm glad that the opposing counsel brought up the crosswalk because Pomona provided a flow diagram that the board explicitly asked Pomona to provide, and that's at the Joint Appendix 85 to 88. And it's a real head-scratcher why the board said Pomona should have produced more. You know, Pomona would have loved to have produced a true crosswalk. But because Pomona asked us for the SSI data, there was nothing Pomona could do to create a crosswalk or otherwise that would get to the level of precision the board demanded. If you look at the pages I referred you to, what the state agency provided were indicator codes that the three state Medi-Cal codes are created from. These are the federal codes that turn into the three codes that tell you someone's an SSI category individual. And if you had an actual diagram that explained what those indicator codes were and the state representative told Pomona, we can't tell you, you need to talk to SSA, well, Pomona spoke to SSA. And that's in this Le Trans declaration, post-hearing declaration, that they couldn't provide the crosswalk. So they provided what they were able to. And if you think about it, getting, even if you knew what each of those indicator codes actually said, other than generally translating it to one of the 3A codes, that wouldn't tell you how many of Pomona's matches were actually something other than active SSI entitlement. That would not tell you any, that would not get you to the level of precision the board was demanding. I'm sorry, the level of detail in the codes is not publicly available? It's not in the record that it's publicly available. The unrevited record is that Pomona was unable to provide more than the flowchart and provided the flowchart. But do you know who could have provided this information to the extent it's relevant? The other side. Why didn't they introduce a code, you know, a paint-by-numbers crosswalk if it was so important to the case? Now, they produced nothing. We provided, Pomona diligently provided specifically what the board asked for, and it couldn't take it any farther. And the problem really wasn't the form of the information, but it was Pomona's lack of access to the underlying SSI data. Let me ask on GA85. When you talk about values, it says, the first indented bullet point, values 2367, blah, blah, blah, blah, are set as line aid code 20. What are these values? Are these federal or is this a California thing? Are you looking at the line? I'm looking at GA85. Yes. Under state processes data, you've got bullet points and then you've got indented bullet points. First use, STX file, multi-category, 015. Under that, it says what shows up is code 20. And what shows up is code 60 and code 10. And it's all preceded by a bunch of numbers or letters that could be defined somewhere else but aren't defined here. Who knows what value 2367FGOPSTYNC are? Those are numbers and codes generated by the SSA. Okay. Those are not California things. Not California, Your Honor. Correct. Those are the indicator values are what the California representative employee told Pomona would be available from the federal government. And then Pomona didn't have access. But also, I just go back to the point that even if you knew exactly what those indicator values said and there was some potential other category of non-SSI payment, that still wouldn't tell you how many of Pomona's days in the match, Pomona believes in the state data from the state aid codes, were incorrect. It wouldn't get you to the precision the board demanded. Well, can I just be clear if I want to bring to you when you say these values are set as blind aid code 20 or set as disabled aid code 60, set as aged aid code 10. Is this exclusive or is this just implicit? When they say these values, are these the only values that get set as blind aid code 20, aid code 60, aid code 10? Or are they saying these things and there could be others? Is it exclusive or implicit? Your Honor, the record is that it's exclusive. These are the only things that California, these numbers and letters from SSI, and those are the only things, the only things that California counts as aid code 20. That's correct, Your Honor. So then it's really just a question of timing. But we know that these same codes are used to cover supplemental payments too, right? Correct. Because the supplemental payment is an automatic payment that someone receives if they're slightly, if they're SSI entitled, they receive the state supplemental payment also. And as we've all gone over, as the court's gone over, some of those days are actually over-accounts because they're individuals who have a higher income, they wouldn't be eligible, they wouldn't receive an SSI payment, just a state payment. But all of that, the unrebutted record there is that that was backed out completely. So let me ask you, so we don't have a perfect comparison of the codes side by side, right, as if you were comparing legal elements of statute A to statute B, right? That would inclusively show what's overlapping and what's not. We don't have that. What we have instead is a lot of expert testimony showing that there were at least three non-overlap issues. And let's just take Judge Walker's formulation that two of them were de minimis and one was corrected for. Where in your case, in your expert testimony, do you get a proposition that there were no other problems or non-overlap than those three? Where do you get that? I think that is where, you know, that's the adversary process. We presented and the board asked about three specific issues. The expert testimony. Yeah, the expert testimony. And in the expert testimony, the experts testified, and this is primarily Mr. Rosenstein, testified that there were these two potential situations, and they were accounted for de minimis, you know, immaterial for purposes of the analysis. They couldn't account for the entire difference. And there were no others identified. Do you have a site for me where he says, and there's nothing else that could explain this difference? There is testimony, and I'd have to find it where he says, I can't think of any other reason. I can't think of any reason why there should have been this enormous difference between what the state data is showing us and the government's matching. So that, I think, is the closest. It's the expert judgment of someone who was in a position to understand all these figures that sort of look like mumbo jumbo to me. But he says there's no other explanation. And they say, the two experts say that, and that's what cinches up the case for you. And, Your Honors, I think what the Secretary's arguing here is that its argument boils down to, we explain what we're going to do in a 2010 rule, but there's nothing more to be done. And as clearly mistakes can be made, clearly we demonstrated mistakes were made in the record, unrebutted. And at that point, I wanted to get to the import of precedent. We believe under the Atlantic College decision that the burden that we did enough to shift the burden to the government put up something to rebut our evidence. And under Atlantic College, it's not necessarily that the government exclusively has access to the information. It has better access. And here we believe the most meaningful information, the only thing that could get to the bottom of the cause and the scope of the match problem would be the SSI data that only the government has access to. So short of having that data, I think you have a slippery slope problem, and the government has flip side, slippery slope. There's always going to be some data set that churns out a different result when the same model is applied, one data set versus another data set. The government has picked its data set, and there's no challenge to saying the government's data set is a perfectly fine data set. Your theory, I think, is that human error or computer glitch, something about the application of the 2010 methodology, the perfectly fine data, perfectly fine choice of data set, led to an error. And we asked the government about that, and she addressed that. My question to you is there's always going to be a better data set for you, not necessarily a more accurate data set. But if you were to go out, you picked Medi-Cal, but, you know, if you were to shop 10 data sets, nine of them lead to a lower number than the government pays you. One of them leads to a higher number than the government pays you. You could just pick that one data set, go to the board, and say, oh, you miscalculated. And let's say you win that case, and then the next time the government, you know, produces a number, you or another hospital could pick not that data set that worked for you last time, but the data set, the one out of 10 that works for you the next time. What's to stop that from happening if we rule for you in this case? What's to stop it from happening is Pomona was now shopping data sets. It was using their two basic sources of data that could tell you something about who has SSI entitlement. One is the federal data. Two is the state Medi-Cal data, because it's… Those are the only two data sets that exist that tells you who is, I mean, you said somewhat, well, people who are low-income, people who have visual impairment, people who have disabilities. Those are the three things. I'm not aware of another data set that would provide that information. Obviously, the federal government's data set has a level of detail that can tell you, yes, someone's receiving payment that month or not. The state data indicates that, and in most instances, it should be accurate, and, you know, we've accounted for the issues. But this isn't like civil litigation where you can go and hire, you know, any number of experts to punch data and come up with different models and analyze things. This is… You didn't do the form shopping equivalent of data set shopping. Correct. And you couldn't. No. And no other hospital could. Other hospitals couldn't do it either. I don't believe so, Your Honor. And the…Pomona didn't set out to get more money. Pomona started this process because its fractions shrunk, and it wanted to know what was going on, and it had a source of data and an analysis that showed that there appears to be something wrong. If those experts said… You probably would not have gone to the board if you found out that you were owed less money. That's absolutely correct. And if Pomona was…Pomona went, when I say and then some, it spent an entire laborious process trying to work with the agency through U.S. senators to get to a resolution. And Pomona was 100%…undisputed testimony, 100% willing to walk away if the SSA had taken the 50 sample set and said, sorry, none of those are matches. Pomona would have walked away. That's the undisputed testimony. Pomona here is trying to find out what happened. And it appears that there's a massive problem in the secretary's actual execution of the 2010 rules match. I mean, the secretary's argument assumes the output is correct because the secretary's inputs and its process are unrebuttably infallible. And you do not contend that the agency used the wrong method. I'm sorry, Your Honor? Make it. The agency used the right methodology, correct? The 2010 methodology? As described in the rule, sure. But what the secretary… You're not challenging that. Correct, Your Honor. Absolutely correct. But the secretary provided nothing to assure the court that the agency's actual matches for Pomona or any hospital reflect the underlying data or use the correct process. No reports, nothing. And there was no validation at all, even in the agency's own process, for the three years at issue here for Pomona's match. The agency's described some validation that might occur for later years, prospectively 2011 and beyond. Nothing for these earlier years. So the secretary undertakes a very significant effort after Bay State to have all these cost reports are on hold. And it corrects across the country all the cost reports, all the SSI fractions for all the hospitals around the country. Hands them out in 2012. And there's literally nothing that the agency produced, that the government produced, to assure the court that it did it correctly. And our data and our unrefuted evidence at the board hearing showed it did not do it correctly. Your theory is that something, even with particular methodology is correct, something went wrong. I forget, you had a line of human error, computer error, or something like that, right? Something went wrong these three years in applying your methodology. Yes, Your Honor. This is 2006 to 2008. Did the same problem continue in 9, 10, 11 and subsequent years? Or is the problem not there and this claim really is confined to something went wrong these three years? In the record, Your Honor, it's focused on these three years. Pomona has appeals for other years. On the same basis, using Med-Cal data? It has board appeals. They have not, none of them have gone to hearings. Is it on the same basis, though, that the gap between the Med-Cal data and what the SSI numbers showed? I believe the board issues are very similar. Very similar. For how many years? I can't recite that off the top of my head, Your Honor. I believe it's for the next several years. Okay. Doesn't that decrease the prospect that it was actually any kind of human error or computer glitch? Because if it was, you wouldn't expect it to be repeating for three, four, five, six years. Well, the problem, Your Honor, is we don't know what the problem was. In base state, they said here's what the problem is. These different types of files aren't being counted. And so isn't that part of your problem here is you went and got some other data and did your best to compare them, but we can't really compare the two exactly is your theory. We can't line them up exactly. We don't have that information. But it seems like every single year for however many years, there's a gap between the two of them. How is that not actually a challenge to the rule decision that these SSI files are the best available data? Your Honor, we're challenging it as applied in each of the cases. And we haven't seen how, other than the results, we haven't seen how it's been applied. But you don't have a theory as to what's wrong with their data. You're not saying there's some – you've got even more than these three years. You've got a lot of years now of some gap between MedCal and SSI. But you haven't yet figured out a theory as to what are they not counting? What is their file not capturing? What are their human beings not capturing? It just seems to me that your collective argument is your files, your SSI files, are not, in fact, capturing what they should. They are not the best available data. As it turns out, at least for Pomona, they're not the best available data. Or maybe for California hospitals, they're not the best available data. Again, I think, Your Honor, they've described the process. They've said what they're doing. We don't know what they're doing. No, but the point of view collectively over all these years making these arguments is that it's not working. You're not getting what you should be getting. That's your argument. That's your argument here is MedCal shows you are not getting all the people you should be getting. You're not disputing that they use the files as they said they would in their rule. You're not disputing that. Correct? We're not disputing that they describe what they're going to do. No, we're not disputing that. And you're not disputing that they did do that other than that there must have been, you know, human error or computer glitch, but that they actually took those steps and then something went haywire in the process itself, but that is actually the process that they applied to you. Yes. I mean, it's supposedly the process that was applied. We're not challenging the process. In the other board appeal. And you're not saying they didn't apply that process here, like intentionally. It's just some accident went on. Something went wrong. We're in a complete information gap as to why it didn't work. We don't know. The secretary's SSI data could demonstrate that. We can't. We can't. I can't make hypothetical arguments. I mean, I can make hypothetical arguments why it could have happened, but I don't think that's going to advance. That doesn't advance our case. We've demonstrated there was an error. The SSI data would demonstrate the cause and the scope. These other cases that have not been, you know, that have not even gone to hearing. I mean, if those cases could conceivably challenge the methodology. I mean, those are other cases. Let me give an analogy, and you tell me if it's related to Judge Follett's question. Imagine a case from my memory where, many years ago, Yale's student clinic, law school clinic, had a policy that the cover page would always say the court that they were litigating. The United States Court of Appeals for the Ninth Circuit. But the first time they did it, it actually said the Untied States of America for the Ninth Circuit. Untied States Court of Appeals. And every time they filed a document in that case, it said the same thing. Their policy wasn't to say Untied States. It was a glitch. It was a human error. And because they started with the wrong template, they repeated the error over and over. It could have gone on for years. Is that at all relevant to the kind of glitch that might explain how this error that you're alleging could go on for years and years and years, even if the methodology is sound? Yes, Your Honor. I mean, if they set up a template, and it's repeated year after year, and the template's incorrect, absolutely, that could perpetuate an error. That wasn't intended, but that is occurring in that process. And if the Secretary has, you know, the Bay State case, the Secretary, of course, said their process was wonderful and should be sustained, and, you know, Bay State demonstrated the opposite. I mean, if it turns out that their process, something is broken, I mean, that, you know, it should be fixed. This is a challenge. This is an as-applied challenge to the agency's process. Yeah, I think the difference is someone could have pretty quickly figured out what the problem was with the difference there, and it's the difference between you and Bay State, again, is over time, you keep finding these gaps, and you've got this data. Shouldn't you have been able to sort of figure out what the problem is and present that to the Secretary? Which of my patients aren't getting counted? Which are showing up here or showing up there? And it's going to be different every year. If it's different every year, then it can't be sort of a common problem then if it's different every year. Sorry, Your Honor. What I mean is it's going to be different patients every year. So anyway, I'd just like to spend two minutes on relief and our cost appeal with respect to the adverse inference. I know I'm well past my time. Since the Secretary here offered no evidence in rebuttal, the Secretary shouldn't get a second bite at the apple. And the court instead should apply an adverse inference by vacating the SSI calculations, going beyond what the district court did, which was to remand the Secretary. Do you have any case where we've done that in an APA remand that you can cite to me? Do you have any case in an APA remand where we applied an adverse inference? Or any court has applied an adverse inference? No, we don't have that, Your Honor. But the same principle, the government had its opportunity to present its defense. It failed to present that information. And it should not get a redo of the actual hearing. Sorry, when you say adverse inference, what exactly do you mean? That we order the agency to go with your California numbers? No, simply that you would vacate. And we 100% acknowledge that. Because your affirmative case is, we don't know what the right number is. We just know that the government's number is wrong. So, I mean, what could we do in those circumstances other than vacate and remand for further proceedings for the government to figure out what the right number is? And this is the additional relief we're asking for, but we believe it's consistent with this court's powers, which is to vacate the SSI calculation. Not simply to vacate the board's decision. Vacate the board's SSI calculations because we've demonstrated they are incorrect. Then it gets remanded to the secretary to recalculate. The secretary is able to use... Vacate, I'm sorry, vacate the action of the Medicare assistance contractor? Vacate the action of the secretary to determine the SSI calculations. And so vacate the secretary's SSI calculations for Pomona and remand to the secretary to recalculate the fractions in accordance with the court's decision. Recalculate how? Just run the data a second time? Rerun the data? They would recalculate and demonstrate, provide their data demonstrating their results. I'm trying to make sure I'm understanding what you're saying. You want them to rerun? So we'll make sure there's not a computer glitch. Why don't you just take those files again and rerun them through your computer again? Or do you want them to run them with the Medi-Cal numbers? Well, I'd love them to just take our numbers and rerun those numbers. Those would be one way to determine if the additional days were accurate or not from the Medi-Cal numbers. That would be the simplest way for the secretary to recalculate on remand. And the secretary could obviously at that point demonstrate that some of our numbers were mismatches and inaccurate. But the secretary would then, part of our requested release would be to have the secretary provide its data, show its map so to speak, and not just show the results. This data is all the stuff that's protected by privacy laws and HIPAA. That's what they would have to show you? Well, it's a little bit of a straw man to say that the government would have to produce all of its SSA data. It would only have to provide the records related to the matches from Pomona. Okay, so it's at the Pomona's to get all this protected information. And yes, your honor, Pomona has already the most sensitive protected information for all of these same patients, of course, because under HIPAA they're permitted to use it for purposes of payment. But the only thing that Pomona doesn't have with respect to these patients, they already know that they're eligible for SSI under the free aid codes. They already know that. The only thing they don't know is if they're receiving active payment or not. So really, the privacy issue is a bit exaggerated on the government's part. And the government, of course, has the ability to provide limited data sets. It did a limited data set. It could modify that for purposes of resolving this case with Pomona. Our jurisdiction is limited to judicial review of any final decision of the board, meaning the PRRB. So where do we get the authority to look beyond that and set aside this SSI calculation, which is a different agency action by a different administrative actor? Ultimately, the appeal concerns the determination of Pomona's SSI calculations. That's the root of it. And your honor is correct that you're reviewing the board's decision, rejecting our appeal. We believe that it would not be inconsistent with this court's authority to direct the calculations because of the hearing process. The secretary offered no evidence to rebut Pomona's case that the calculations themselves may be vacated. Thank you very much. We'll give the government two minutes. I think you wanted to cross-appeal rebuttal as well? Excuse me? You asked for a cross-appeal rebuttal as well? The government's going to get rebuttal now, and I understand you wanted a rebuttal just— Just a minute, if we may. —solely on your cross-appeal issue. Yes, your honor. Thank you, your honor. On the cross-appeal, we'll just rely— Could you just put the mic down? Is that better, your honor? Can you hear me now? And on our appeal, it is going to JA 85 and 86, which Mr. Collins referred to. That is nothing like a crosswalk. It's just the process by which the state gets the data and puts it in the different categories. And that's not what the board was asking for, and it's not— Why doesn't it provide what you asked for, which is a definition of what gets covered under these codes? This is what 10, 20, and 60 cover, and that is the numbers and letters listed there from SSI, which would allow very easily to say, well, you shouldn't be including 7, or you shouldn't be including S, or Y. It gives you what you said before was, we don't even know what these definitions mean or how they map on to SSI. It seems to me that it answers that question. The SSI codes, I meant, sorry. No, I don't—I mean, I don't think it does because they don't say what those codes are. They say they're your codes. They said they—now, these are different from—I mean, I don't know if the S code is an S code that was discussed in the rulemaking, for example, of suspending— Why does it matter? They say these are numbers that come from SSI, and that's what we put into aid code 10, which apparently—or, yeah, 10, which corresponds with those who are blind, and these are your numbers. But they don't explain whether that is limited, and it clearly isn't limited to just people receiving payments because they include the SSP, and they include the nursing home, and they include the different— This isn't an actual explanation of what the limits of those codes are. And, you know, probably more important, Judge Walker, you asked a key question here, which, what is the limit of what the hospital— You know, if the court allows the hospital to go forward with this kind of data, other hospitals in other states presumably have state data. And if they hear—the board is best positioned to judge this data and examine it. It heard the witnesses. Mr. Rosenstein, they referred to his declaration. He was certified as an expert on the California program, but not on how it corresponds to Social Security. And the board had a lot of questions. And, again, the board initially pointed out this very, very large mistake on the state supplemental payment. If there is a discrepancy, it could be a California computer problem. It could be a California human error. So this could happen in all 50 states? Yeah. And that's either a feature or a glitch. If you're actually doing it wrong because of human error or computer problems in all 50 states, you should want these challenges to be raised in all 50 states. I'm sure you want to be paying whatever the accurate amount is. It would be a glitch if there's the kind of data set shopping that I hypothesized. Your opposing counsel said that's just not a concern at all. Do you agree with him or disagree with him when he says there's really no reason to worry about data set shopping? I don't know about data set shopping, Your Honor, but I do think there is a worry about relying on hospitals coming forward to try to invalidate factions based on unreliable data and not the best available data. And what we're saying, yes, we certainly, the agency, we hope that the 2010 rulemaking reflects this, that the agency is trying to do it as accurately as possible with the best available data. If the hospitals didn't meet the high burden and could somehow show that this really did occur, our point is they didn't here. What are you saying they can't rely on state data to do that? I don't know what else they would use. No, we're not saying that they can't. We're saying that here they didn't show that there was sufficient congruence between the state data and the SSA data. I know, and you say, well, maybe there's something wrong with California computers. I can't prove a lot of negatives. No, but that's just another example of if you have one of the problems and why the burden of proof is on the hospital here, that the secretary has set up the system. And if there were computer glitches or human error, presumably quite a few of them would be caught by the MedCard date, which is what Congress passed, Section 951. Since the 2005 rulemaking, Congress hasn't indicated that the secretary needs to turn over any additional information. They have all the information legally and required under the statute and the regulations, and that information does give them a way to look to see if there is a kind of glitch in the federal system, because they can look at the number of patient days, and they can look at the number of entitled days, and if that information doesn't match with the MedCard data. But the problem here, they're using a whole separate set of data. And they haven't established to the extent that we're not saying it's impossible. We're just saying they didn't do it here, and the board went through step by step why they didn't do it, held a full hearing, allowed them to submit as much evidence as they could, and they didn't do several of the additional evidentiary things that the board asked for. And for that reason, and the board's decision should get some deference from this court under APA deferential review. And so we would ask that you reverse the district court and hold that the board's decision was supported by substantial effort. Thank you. Thank you. Thank you. Nance, we'll give you one minute. The court asked if there was any precedent where the court set aside the agency's fractions in this scenario, and that is actually the base date order from the district court with the secretary's agreement, which the secretary agreed with, was that the fractions should be vacated and remanded to the secretary to recalculate them. Yeah, but there they found a legal error in what they were covering and not covering, and so they just said, you know, you can't be excluding these things. You're not alleging legal error. You're alleging human error or computer error here, right? Right. Again, I. You don't know what the error is. Absolutely, Your Honor. But the print, abstractly, it's the same thing, that the fractions there were vacated, whether it was because it was actually a legal process error. They didn't count the days they should have. It's not the same thing. It's a legal error. Then courts can tell the secretary or the board to ensure that this decision comports with what the law requires. But there isn't a legal challenge here for us to tell them that they need to comport with on remand. But the legal challenge is we've demonstrated that their calculations are wrong, and we've proved it. The government didn't rebut. Thank you, Your Honor. Thank you. The case is submitted. Thank you.
judges: Millett, Katsas, Walker